IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| THE NEW HAMPSHIRE INSURANCE CO., | ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) CASE NO. 3:10-0607 ) JUDGE SHARP/KNOWLES ) ) |
| BLACKJACK COVE, LLC, | ) ) |
| Defendant/Counter Plaintiff. | ) |

## ORDER

This matter is before the Court upon Plaintiff's "Motion for Protective Order and Motion to Quash." Docket No. 49. Plaintiff has filed a supporting Memorandum of Law (Docket No. 50) and a number of Exhibits. Defendant has filed a Memorandum in Opposition to the Motion (Docket No. 53), and Plaintiff has filed a Reply (Docket No. 62). The Motion seeks a protective order with regard to, and the quashing of, a subpoena issued to Ruben Maxwell. Docket No. 47-1. As will be discussed in greater detail below, there is no question that Mr. Maxwell was hired as an investigator by counsel for Plaintiff, and Plaintiff contends that the documents sought in the subpoena constitute work product. Defendant primarily argues that Plaintiff has waived any work product privilege with regard to the documents.[1] Defendant further argues that "many of

---

[1] The subpoena at issue is a subpoena duces tecum, requiring Mr. Maxwell to give testimony and to produce documents. Docket No. 47-1. The instant Motion, Opposition and Reply focus solely upon the production of documents, not whether Mr. Maxwell will testify or not. Thus, the Court will not address any issue of Mr. Maxwell's testimony.

the documents . . . are not work product at all." Defendant, however, does not specify which documents it means. Additionally, Defendant raises an argument that some of the documents were not prepared in anticipation of litigation or for trial. Again, however, Defendant is not specific as to which documents it means.

The following background information is necessary to an understanding of the issues raised in the instant Motion.

Plaintiff issued an insurance policy to Defendant, effective March 26, 2009, covering the Blackjack Cove Marina on Old Hickory Lake, a navigable waterway within this district. Subject matter jurisdiction in this action is based on the Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333.

According to the Amended Complaint, Plaintiff purchased the Marina on or about March 26, 2009, for approximately $2,500,000. Unfortunately, seven (7) days later, on April 2, 2009, a storm caused major damage to the Marina. Plaintiff retained a marine surveyor, who twice inspected the Marina. He approved and submitted to Plaintiff for payment a typed bid identified as a bid from Bobby Reed Marina Works ("Bobby Reed bid") to repair and replace damage to the Marina.[2] The total amount of the Bobby Reed bid was $2,620,558. Over the next four (4) months, Plaintiff paid Defendant (and/or its mortgagee) the full amount of the Bobby Reed bid, less a $25,000 deductible. Despite these payments, Defendant has made additional claims of approximately 1.1 million dollars.

Plaintiff claims that it subsequently obtained information that the Bobby Reed bid was

---

[2] Defendant later takes the position that the "Bobby Reed bid" was not actually a bid at all, but was simply an "estimate." Docket No. 65, p. 3.

2

not prepared by Bobby Reed and was unknown to Mr. Reed or Bobby Reed Marine Works. Plaintiff further avers that Mr. Reed has told one of its representatives that "the maximum damage resulting from the storm was $500,000." Docket No. 56, p. 9. There is also a controversy between the parties concerning whether certain of the docks for which Defendant claimed damages (the "Drakes Creek docks") were located at the Marina at the time of the storm and/or had been damaged in an earlier storm, and whether Defendant actually owned the Drakes Creek docks at the time of the April 2, 2009, storm.

In its Complaint, Plaintiff asks that the Court declare:

> 1. Whether the Policy is void.
>
> 2. Whether [Plaintiff] has any further liability to [Defendant], and if so, the amount of any such liability and enter a judgment accordingly.
>
> 3. Whether [Defendant] is liable to [Plaintiff] and if so, the amount of any such liability and enter a judgment accordingly.
>
> 4. Whether [Defendant] had an insurable interest in the Drakes Creek Dock on the effective date of the Policy. . . .

Docket No. 56, p. 22.

Defendant disputes that it has any liability to Plaintiff, and has filed a counterclaim seeking damages over and above the $2,595,588 Plaintiff has already paid.

With the instant Motion, the parties have a submitted a "Joint Written Statement" pursuant to Local Rule 37.01(a). In that statement, Plaintiff sets forth its position that the materials sought in the subpoena are protected by the work product doctrine. Defendant states

3

its position that Plaintiff has waived any protection that may have otherwise applied to these documents and items. Docket No. 52. While most of Defendant's opposition is based on a waiver argument, Defendant also attempts to argue that at least some of the documents are not protected by the work product doctrine. Docket No. 53, p. 13-19.

The factual basis underlying the issue at hand seems to be fairly straightforward. Defendant selected an insurance agent, Joe DePasquale, to obtain insurance for the Marina. He obtained the policy through Plaintiff's underwriting agency, Maritime General Agency ("Maritime General"). After Plaintiff paid Defendant, DePasquale became concerned about some aspects of Defendant's claim, and he spoke with Damon Pesce and Chris Pesce of Maritime General to express his concerns. DePasquale testified in his deposition that two things motivated his call [to Pesce]. He then listed these concerns:

> One was the concrete blocks, disposal of the salvage, and the notification that the docks were damaged – that the used Drakes Creek docks were damaged. That was of concern.

Docket No. 50, p. 6.

Specifically, DePasquale was concerned that the Drakes Creek docks had sustained prior damage and were not in the path of the April 2, 2009, storm. He testified that it "disturbed" him that the Drakes Creek docks were going to be part of the claim. *Id*., p. 7-8.

Damon Pesce testified in his deposition that "to the best of [his] recollection, DePasquale] called [him] to tell [him] that he [DePasquale] suspected there was funny business going on, and he encouraged [him] to investigate the funny business in regards to the claim." Docket No. 50, p. 8. Damon Pesce further testified, "Joe D. told me that there was a crooked adjuster that was in the back pocket of the owner. He told me that the folks who owned

4

Blackjack were bad people and scared him." *Id*.

Chris Pesce testified that he had a telephone conversation with DePasquale in July or August 2009. Chris Pesce gave the following testimony:

> Q. What did Joe D tell you during that conversation about Blackjack Cove?
>
> A. Something to the effect of – that he understood that there was some, shall we say, foul play going on, that – and I don't know how he came about the information that he came about, but that there was – that he suspected that there was false claim being put in, or at least an inflated claim being put in, and that it's something that the insurance company should look further into.
>
> Q. What else did he say during that conversation?
>
> A. I don't recall specifically. I think he mentioned that surveyor might've been complicit in it –
>
> Q. Okay, do –
>
> A. And that the –
>
> Q. I'm sorry I didn't realize you weren't finished. Go ahead and finish your answer.
>
> A. I was just going to say that it was a coordinated effort in what amounted to pulling off insurance fraud.

Docket No. 50, p. 9-10.

Chris Pesce told Robert Milana, apparently an employee of Maritime General, the substance of the conversation with DePasquale. Mr. Milana, in turn, spoke with Susan Smith, another employee of Plaintiff (or Maritime General) and relayed to her the substance of Chris Pesce's call with Mr. Milana. She testified in part as follows:

> Q. And what do you understand that Robert Milana was told in that call?

> A. To the best of my recollection he was told that the claim was inflated.
>
> Q. Anything else?
>
> A. That we needed to look into the insured, the claim that he submitted, because there were strong indications of fraud.
>
> Q. Anything else specifically that was told to him about what indications – "indications of fraud" there were or what the basis of this statement was by the person Chris Pesce?
>
> A. I wasn't part of the conversation. That's basically what I was told: there's issues with this claim and that there was potential fraud by the insured.
>
> Q. And who told you that?
>
> A. Robert Milana.

Docket No. 50, p. 11-12.

Ms. Smith stated in her Affidavit that, after learning the foregoing, she "had a subjective belief that litigation was a real possibility, sufficient to authorize Allan Thorp, our counsel, to hire an investigator [Mr. Maxwell]." Docket No. 49-6, p. 4. She testified that she "advised counsel" and that they "were instructed to reinvestigate that on behalf of underwriters." *Id.*, p. 12. Ms. Smith advised Plaintiff's counsel to "investigate the claim." Counsel, thereafter, retained Mr. Maxwell to investigate. Discussions with Mr. Maxwell concerning his investigation were "through counsel." *Id.*, p. 2.

Defendant subsequently served a subpoena upon Mr. Maxwell, seeking the production of the following documents:

> 1. All reports prepared by you or on your behalf regarding your investigation concerning Blackjack Cove's claim for insurance benefits, or otherwise mentioning or concerning Blackjack Cove, Drakes Creek Marina, Bart Bagsby, the April 2009 storm at

6

Blackjack Cove, or the repairs and construction at Blackjack Cove.

2. All drafts of reports prepared by you or on your behalf regarding your investigation concerning Blackjack Cove's claim for insurance benefits, or otherwise mentioning or concerning Blackjack Cove, or the repairs and construction at Blackjack Cove.

3. All notes regarding, or taken during, your investigation concerning Blackjack Cove's claim for insurance benefits, or otherwise mentioning or concerning Blackjack Cove, Drakes Creek Marina, Bart Bagsby, the April 2009 storm at Blackjack Cove, or the repairs and construction at Blackjack Cove.

4. All emails and other correspondence between you and New Hampshire Insurance Company (or anyone acting on behalf of New Hampshire Insurance Company) regarding your investigation concerning Blackjack Cove's claim for insurance benefits, or otherwise mentioning or concerning Blackjack Cove, Drakes Creek Marina, Bart Bagsby, the April 2009 storm at Blackjack Cove, or the repairs and construction at Blackjack Cove.

5. All emails and other correspondence between you and Allan Thorp, Elissa Marcopulos, or any other individual at Brattan, O'Neal & Thorp, P.C. regarding your investigation concerning Blackjack Cove's claim for insurance benefits, or otherwise mentioning or concerning Blackjack Cove, Drakes Creek Marina, Bart Bagsby, the April 2009 storm at Blackjack Cove, or the repairs and construction at Blackjack Cove.

6. All recordings made by you or on your behalf during your investigation concerning Blackjack Cove's claim for insurance benefits.

7. All written statements, summaries of interviews, or other documents reflecting any communications or discussions between you and any person during your investigation concerning Blackjack Cove's claim for insurance benefits, or otherwise mentioning or concerning Blackjack Cove, Drakes Creek Marina, Bart Bagsby, the April 2009 storm at Blackjack Cove, or the repairs and construction at Blackjack Cove.

8. All emails, correspondence, notes and other documents concerning or mentioning Blackjack Cove, Drakes Creek Marina, Bart Bagsby, the April 2009 storm at Blackjack Cove, repairs and

> construction at Blackjack Cove, or your investigation concerning
> Blackjack Cove's claim for insurance benefits.
>
> 9. All other documents relating to Blackjack Cove, Drakes Creek
> Marina, Bart Bagsby, the April 2009 storm at Blackjack Cove,
> repairs and construction at Blackjack Cove, or your investigation
> concerning Blackjack Cove's claim for insurance benefits.
>
> 10. All invoices, including those already submitted as well as
> those waiting to be submitted, for any time spent or expenses
> incurred during your investigation concerning Blackjack Cove's
> claim for insurance benefits, or otherwise relating to Blackjack
> Cove, Drakes Creek Marina, Bart Bagsby, the April 2009 storm at
> Blackjack Cove, or the repairs and construction at Blackjack Cove.

Docket No. 47-1, p. 4-5.

Plaintiff responded to most of the subpoena stating that the materials sought were "protected from disclosure" on the basis of the work product doctrine. Plaintiff also stated that there were no documents responsive to Item Nos. 2 or 3. With regard to Item 1, seeking "reports," it is important to note that Plaintiff stated that it had "previously provided all reports up to the date suit was filed." According to Plaintiff, acting "[i]n the spirit of cooperation," it previously produced copies of Mr. Maxwell's "fact reports and the transcripts of the recorded statements of Bobby Reed and Ronnie Silvera," to Defendant. Docket No. 62, p. 5.

The work product doctrine is partially codified in Fed. R. Civ. P. 26(b)(3), which is derived from *Hickman v. Taylor*, 329 U.S. 495 (1947). The Rule states in relevant part:

> (A) Documents and Tangible Things. Ordinarily, a party may not
> discover documents and tangible things that are prepared in
> anticipation of litigation or for trial by or for another party or its
> representative (including the other party's attorney, consultant,
> surety, indemnitor, insurer, or agent). But, subject to Rule
> 26(b)(4) [pertaining to expert witnesses], those materials may be
> discovered if:
>
> > (i) they are otherwise discoverable under Rule

8

> 26(b)(1); and
>
> > (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.
>
> > (B) Protection Against Disclosure. If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

It appears from Defendant's Memorandum that its primary argument is that the work product privilege has been waived. Defendant, however, also makes rather cursory arguments that the work product privilege does not apply to at least some of the documents, although Defendant is not specific as to which of those documents it means. Defendant offers two main arguments with regard to the proposition that the documents are not covered by the work product privilege: (1) anticipated litigation was not the "driving force" behind the preparation of the documents; and (2) Mr. Maxwell was hired to investigate "coverage," not possible inflation of the claim or fraud.

There is no question that the subpoena seeks documents and/or tangible things that were prepared by Defendant's "representative, consultant . . . or agent," Mr. Maxwell. The question, therefore, becomes whether the documents were prepared "in anticipation of litigation or for trial." Defendant contends that the burden is upon Plaintiff to show this, and that Plaintiff has not sustained its burden.

Defendant contends that "many of the documents" were prepared merely with the "possibility" of litigation. Docket No. 53, p. 13. Defendant contends, however, that the

9

anticipated litigation must be the "driving force" behind the preparation of the documents in order for the work product privilege to apply. *Id.*, citing *In Re Professional Direct Ins. Co.*, 578 F.3d 432, 439 (6th Cir. 2009). Defendant also argues in part:

> In the present case, Susan Smith testified repeatedly that [Plaintiff] retained counsel to *determine coverage* and to provide a "coverage opinion" shortly after Blackjack Cove filed its supplemental claim. . . . Critically, [Plaintiff] had not decided to deny the claim, and did not have any proper basis for denying the claim or for filing the instant lawsuit, when it requested a coverage opinion from counsel. [Plaintiff] cannot argue that it had enough information to warrant either denying the claim or filing a lawsuit at the time Ms. Smith initially contacted counsel for a coverage opinion.

Docket No. 53, p. 15 (emphasis in original).

Although this latter argument is somewhat unclear, it rests in large part upon Ms. Smith's characterization in her deposition that Mr. Maxwell's investigation "was all done in conjunction with coverage counsel." Docket No. 53, p. 16. Unfortunately, again, Defendant completely fails to explain exactly what it considers to be the "coverage investigation."

As Plaintiff argues, however, it seems clear that Mr. Maxwell was retained in anticipation of litigation to investigate possible fraud or other misconduct and that his investigation was not concerned with whether there was coverage under the policy. Docket No. 62, p. 1. As Plaintiff cogently argues, at the time Mr. Maxwell was retained, Plaintiff had already paid Defendant approximately 2.6 million dollars for its claim under the policy, because there was no question that the storm "was covered." *Id.*, p. 3. As Plaintiff further argues:

> All matters regarding Mr. Maxwell's investigation into possible fraud or other misconduct were conducted in anticipation of litigation. The mental impressions, conclusions, opinions, and legal theories, sought both through Mr. Maxwell's testimony as well as through his notes and communications with [Plaintiff's] counsel and with [Plaintiff] are protected by the work product

10

>doctrine, because they concern the possible fraud or other
>misconduct investigation, which was conducted in anticipation of
>and directly led to the present lawsuit.

*Id.*, p. 5.

Defendant also makes an argument that, at the time Mr. Maxwell was hired, Plaintiff did not have any facts suggesting that Defendant did anything suspect in connection with its insurance claim. Docket No. 53, p. 17. Defendant states that Plaintiff already knew, or could have easily confirmed, that the statements allegedly made by Mr. DePasquale had no basis in fact. But it appears to the Court that Mr. Maxwell was hired precisely for that reason – to investigate and determine whether the possibility of an inflated claim and/or fraud did have support.

Defendant's primary argument appears to be that, by producing certain of Mr. Maxwell's redacted reports in response to subpoena item No. 1, Plaintiff has waived work product protection for all the materials sought. Plaintiff argues that its production of this "fact" work product does not waive work product protection for the "opinion" work product Defendant seeks. *Id.* Plaintiff argues:

>Even if "fact" work product is discovered, the court "must protect
>against disclosure, mental impressions, conclusions, opinions, or
>legal theories of a party's attorney or other representative
>concerning the litigation." Fed. R. Civ. P. 26(b)(3).

Docket No. 62, p. 6.

The Court agrees with Plaintiff that, by producing certain "fact" work product, it has not waived any privilege with regard to "opinion" work product.

Defendant next argues that, when a case involves questions of whether a party acted in good faith, even a small level of reliance upon privileged communications waives protection

normally afforded by the work product doctrine.  Defendant, however, offers no citation for the proposition that Plaintiff will rely on communications with Mr. Maxwell as evidence of its "good faith."

Defendant states that "by relying on Mr. Maxwell's investigation as evidence of good faith and by producing selections from Mr. Maxwell's file, [Plaintiff] has waived any protection that may have otherwise existed."  After making this statement, however, Defendant never explains exactly how, when, or where Plaintiff has relied on Mr. Maxwell's investigation as "evidence of good faith."  In its Opposition, Defendant again refers to waiver on grounds that Plaintiff has cited to Mr. Maxwell's reports as evidence of its good faith.  Docket No. 53, p. 7.  Defendant also states that Plaintiff "based its decision to file the instant lawsuit on Mr. Maxwell's investigation and reports . . . ."  *Id.*  Unfortunately, Defendant again provides no citations whatsoever to support these arguments.

Defendant's arguments, however, prove too much.  If a party could overcome work product protection simply by averring that the other party had not acted in good faith, or had acted in bad faith, there would be virtually nothing left of the work product doctrine.  Similarly, while Defendant fails to cite the record for the proposition that Plaintiff's decision to file the instant lawsuit was based on Mr. Maxwell's investigation and reports, even that would not defeat work product protection for Mr. Maxwell's investigation and reports.  Presumably, any party who hires an investigator to make an investigation and to write reports will rely upon those to some extent in making decisions concerning litigation.

Defendant next argues that a finding of waiver in the case at bar is consistent with the "new rule" governing waiver and disclosure cases found in the Federal Rules of Evidence.

12

Defendant states:

> Rule 502(a) explains that when work product is intentionally disclosed, the waiver extends to undisclosed communications or information if the disclosed and undisclosed communication or information concern the same subject matter and *they ought in fairness* be considered together.  Here [Plaintiff] has not only cited to Mr. Maxwell's investigation in support of its claim, it has also disclosed Mr. Maxwell's reports.

Docket No. 53, p. 7-8 (emphasis added).

As discussed above, Plaintiff explains that it provided certain of Mr. Maxwell's reports to Defendant because those reports contained "fact" work product, not "opinion" work product. With all due respect, under these circumstances, fairness does not require the production of the opinion work product.

Defendant further argues that, by relying upon Mr. Maxwell's reports, Plaintiff "has transformed Mr. Maxwell into a testifying expert and all documents requested in the subpoena must he produced."  Docket No. 53, p. 10.  Once again, however, Defendant offers no citation for the proposition that Plaintiff will rely upon Mr. Maxwell as an expert.  Plaintiff denies that Mr. Maxwell will testify as an expert (although apparently he will testify).  Docket No. 62.  Defendant cites cases with regard to documents given to "testifying experts."  Those cases are not applicable to the instant situation because Mr. Maxwell is not a "testifying expert."

For the foregoing reasons, the Court concludes that the documents sought in the subpoena constitute work product, and that Plaintiff has not waived that work product protection.  Therefore, the instant "Motion for Protective Order and Motion to Quash" (Docket No. 49) is GRANTED.

IT IS SO ORDERED.

13

Case 3:10-cv-00607   Document 124   Filed 01/31/13   Page 13 of 14 PageID #: 3447

_____
E. Clifton Knowles
United States Magistrate Judge