# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

NEW HAMPSHIRE INSURANCE CO., )
)
    **Plaintiff/Counter-Defendant,** )
)     **No. 3:10-cv-607**
**v.** )
)     **Judge Sharp**
BLACKJACK COVE, LLC )
)
    **Defendant/Counter-Plaintiff.** )

## MEMORANDUM

This insurance dispute arises from a tornado that hammered parts of the Nashville metropolitan area in April 2009. The case started when New Hampshire Insurance Company filed a declaratory-judgment action to clarify its obligations under a policy it sold to Blackjack Cove, LLC, which operates a marina at Old Hickory Lake northeast of Nashville. Blackjack then counterclaimed against New Hampshire. Pending before the Court are four motions, all of which are fully briefed. For the following reasons, the Court will deny New Hampshire's first motion for partial summary judgment, (Docket No. 86); grant in part and deny in part Blackjack's motion for partial summary judgment, (Docket No. 88); grant in part and deny in part New Hampshire's second motion for partial summary judgment, (Docket No. 133); and deny New Hampshire's motion to strike, (Docket No. 139).

## BACKGROUND

In early 2009, Bart Bagsby began investigating the possibility of purchasing a marina on Old Hickory Lake. Bagsby formed Blackjack Cove, LLC and through it purchased the marina on March 26, 2009, for $2,500,000. Prior to the closing, Bagsby contacted Joe De Pasquale, an agent who handled insurance needs for the marina's prior owners, to obtain insurance coverage

for the marina.  De Pasquale connected Blackjack with New Hampshire, which issued a Marina Operators insurance policy to Blackjack with an effective date of March 26, 2009.  The policy included a schedule of covered property—mainly docks and related structures—and provided that New Hampshire would "determine the value of Covered Property in the event of loss or damage at replacement cost (without deduction for depreciation) as of the time of loss or damage."  A week after Blackjack closed on the marina, a storm swept through the area on April 2, 2009, damaging the marina.

Blackjack sought coverage for the storm damage from New Hampshire.  After viewing the damage onsite, De Pasquale submitted a Notice of Loss describing the occurrence as a "tornadic wind" that "shifted docks."  New Hampshire assigned the damage claim to adjuster Susan Smith at AI Marine Adjusters.  Smith's role was to review information related to the claim and determine the cause and extent of the damage.  Smith retained Ron Silvera, a marine surveyor, to go to the marina to determine what damage the storm caused and what damage predated it, as well as to provide a reasonable estimate of the repair costs.

Silvera inspected the marina two times before New Hampshire paid on the storm-damage claim.  On April 4, 2009, two days after the storm, Silvera toured the marina with Bagsby and Bobby Reed, one of the marina's former owners whom Blackjack employed as a consultant. Reed operated several marine-service companies, including Bobby Reed Marine Works.  Silvera understood that Bobby Reed Marine Works was Blackjack's designated repair contractor and so asked Reed to put together an estimate of storm-related repair costs.

By the time he returned to the marina for a second inspection on April 18, 2009, Silvera had received a "Storm Damage Bid" on the letterhead of Bobby Reed Marine Works.  Silvera

discussed the estimate with Reed and Bagsby and asked that certain revisions be made. After Silvera confirmed that everything on the estimate was damage he identified, New Hampshire paid Blackjack $2,595,558, the full amount of the bid less a $25,000 deductible. New Hampshire did not request any other bids or otherwise seek to corroborate the estimate.

In July 2009, Blackjack submitted a supplemental claim for lost business income and other expenses for over $1 million. Smith was dismayed because she understood that the nearly $2.6 million paid to Blackjack addressed all of the storm damage, so New Hampshire retained coverage counsel. The parties dispute the reason for doing so: New Hampshire says it was to ensure it met its policy obligations under Tennessee law; Blackjack insists it was to dig up dirt to support a decision New Hampshire already made to deny the supplemental claim. Whatever the reason, at roughly the same time as the supplemental claim came in, Smith learned from a co-worker that De Pasquale suspected "funny business" in Blackjack's claim, which was possibly inflated and fraudulent, and advised that New Hampshire should look into it. New Hampshire then instructed its coverage counsel to review both the initial and supplemental claims.

New Hampshire's investigation uncovered several facts—all of them disputed. First, New Hampshire learned that Bagsby, not Reed, had typed the bid and drafted the letterhead. (In fact, Reed told New Hampshire's investigator that he had never seen it, but then submitted a sworn affidavit saying that he simply did not type the bid.) Second, New Hampshire discovered that construction at the marina—which took several months in 2009 and included the repair of docks damaged in the storm as well as other planned renovations and new construction—was not undertaken by Bobby Reed Marine Works; instead, a construction company Bagsby controlled set about doing the job. Third, New Hampshire contends that when the storm occurred

Blackjack did not own the so-called Drakes Creek docks, an asset for which Blackjack had sought coverage in both the initial and supplemental claims.

In January 2010, with the supplemental claim still pending, New Hampshire sent a notice of non-renewal to Blackjack. On June 21, 2010, New Hampshire sent a lengthy letter to Blackjack describing for the first time the insurer's concerns. That same day, it filed this declaratory-judgment action to determine its obligations under the policy. Blackjack filed counterclaims two months later alleging breach of contract, bad faith, fraud and misrepresentation, and violations of the Tennessee Consumer Protection Act.

## LEGAL STANDARD

A party may obtain summary judgment if the evidence establishes that there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the Court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question is whether any genuine issue of material fact is in dispute. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported summary-judgment motion, the nonmoving party must set forth specific facts that show a genuine issue of material fact for trial. If the party does not do so, summary judgment may be entered. Fed. R. Civ. P. 56(e). The nonmoving party's burden to point to evidence demonstrating a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex*, 477

U.S. at 325.  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  When ruling on cross motions for summary judgment, the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party."  *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

## ANALYSIS

### I.  *New Hampshire's first motion for partial summary judgment*

New Hampshire seeks summary judgment on Blackjack's bad-faith and Tennessee Consumer Protection Act claims.

### A.  *Bad-faith claim*

New Hampshire asks the Court to find that no reasonable jury could conclude that it handled Blackjack's initial and supplemental claims in bad faith.  Section 56-7-105 of the Tennessee Code penalizes an insurer's bad-faith refusal to pay claims under a policy "when a loss occurs and the[] [insurer] refuse[s] to pay the loss within sixty (60) days after a demand has been made."  Tenn. Code Ann. § 56-7-105(a).  "A penalty is not appropriate when the insurer's refusal to pay rests on legitimate and substantial legal grounds."  *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 378 (6th Cir. 2007) (internal quotation marks omitted).  "The language of this statute expressly applies to insurance companies and provides that a jury decide whether the evidence demonstrates bad faith on the part of the insurer."  *Gaston v. Tenn. Farmers Mut. Ins. Co.*,120 S.W.3d 815, 822 (Tenn. 2003).  The insured has the burden to prove the insurer's bad faith.  *Palmer v. Nationwide Mut. Fire Ins. Co*., 723 S.W.2d 124, 126 (Tenn. Ct. App. 1986).  To recover, "an insured must establish that (1) the policy was due and payable; (2) a formal demand

for payment was made; (3) the insured waited 60 days after making his demand before filing suit, unless the insurer refused to pay prior to the expiration of the 60 days; and (4) the refusal to pay was not in good faith." *Heil Co. v. Evanston Ins. Co.*, 690 F.3d 722, 730 (6th Cir. 2012). The parties quarrel over only the fourth element.

Disputed issues of material fact preclude resolving this question as a matter of law. The Court highlights the following non-exhaustive set of examples. With respect to the initial storm-damage claim, a jury could find that New Hampshire acted in bad faith because its payments totaling $2,595,558 did not comport with the terms of the policy and the extent of the claim submitted. For example, Silvera, the surveyor New Hampshire retained, testified in a deposition that New Hampshire may not have adjusted the initial claim according to the policy's terms, as the $2.6 million it paid did not reflect a loss valuation based on replacement cost with no downward adjustment for depreciation. (Docket No. 108-5 at 73–74). Moreover, Silvera said that amount "didn't take into account unforeseens or reserves" included in the repair estimate he determined to be reasonable and submitted to New Hampshire. (*Id*.; Docket No. 68 at 3–4). Among other factual questions, a jury will need to resolve whether the $2.6 million payment comported with the policy's requirement to pay Blackjack's replacement cost without deduction for depreciation, and whether New Hampshire justifiably withheld payment for reserve costs included in its own surveyor's assessment.

The same is true with respect to the July 2009 supplemental claim. For example, Blackjack alleges it incurred costs because New Hampshire required it to hire security services after the storm and to remove concrete walkways so the insurer's surveyor could better assess damage he otherwise could not see. (Docket No. 68 at 37–38). Blackjack's supplemental claim included these costs, but New Hampshire has not adjusted this portion of Blackjack's claim.

Moreover, Blackjack asserts that New Hampshire's reasons for nonpayment—namely, Blackjack's decision to not use the vendor New Hampshire assumed would perform the repair work, and the fact that Blackjack spent the insurance proceeds on items that were not part of the covered damages—were not based on terms found anywhere in the policy. (*Id*. at 28–29). To the contrary, New Hampshire's adjuster, Susan Smith, testified repeatedly that these requirements were the "intent" of the policy, even if they were not explicitly in the policy. (*See, e.g.*, Docket No. 108-6 at 14–26). If a jury finds New Hampshire denied Blackjack's claims for reasons untethered to the terms of policy to which New Hampshire bound itself, it could reasonably conclude that New Hampshire acted in bad faith.

Obligated to draw all reasonable inferences in favor of Blackjack, the Court concludes that disputed issues of material fact exist with respect to New Hampshire's bad faith in handling its insured's claims.

### B. *Tennessee Consumer Protection Act claim*

The Tennessee Consumer Protection Act (TCPA) provides a cause of action for an insurer's unfair or deceptive acts and practices. *Gaston*, 120 S.W.3d at 822. Under the statute, "[a]ny person who suffers an ascertainable loss of money or property . . . as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages." Tenn. Code Ann. § 47-18-109(a)(1). "A deceptive act or practice is one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as to a matter of fact." *Morrison v. Allen*, 338 S.W.3d 417, 439 (Tenn. 2011) (internal quotation marks omitted). An act or practice is unfair if it "causes or is likely to cause substantial injury to consumers which is not

reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." *Id.* (internal quotation marks omitted). An insurer may violate the TCPA if it attempts to violate the terms of the policy, deceive the insured about the policy's terms, or otherwise acts unfairly. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 926 (Tenn. 1998). While the standards used to determine whether a representation is "unfair" or "deceptive" under the TCPA are legal issues for the Court, whether a specific representation is "unfair" or "deceptive" is a question of fact. *Morrison*, 338 S.W.3d at 439 (internal quotation marks omitted).

For many of the same reasons that the Court cannot establish that New Hampshire is not liable for alleged bad faith as a matter of law, the presence of similar factual questions stand in the way of summary judgment on Blackjack's TCPA claim. For one thing, a jury will have to determine if New Hampshire's failure to adjust Blackjack's claims because they allegedly violated the "intent" of the insurance policy—and not its actual terms—amounts to an attempt to violate the policy's terms. For another, a factfinder will have to pass on Blackjack's allegation that New Hampshire failed to provide its own insured with a written copy of the policy until after New Hampshire issued several payments on the initial claim. (Docket No. 68 at 4). Once again, while these examples are not exhaustive, they underscore that issues of material fact exist as to whether specific representations New Hampshire made were unfair or deceptive.

The Court denies New Hampshire's first motion for partial summary judgment.

## II. *Blackjack's motion for partial summary judgment*

Blackjack seeks partial summary judgment on four issues.

*A. Interpretation of the policy*

First, Blackjack seeks summary judgment on the proper interpretation of the policy. Specifically, Blackjack asks the Court to hold as a matter of law that the policy 1) provides "replacement cost (without deduction for depreciation) as of the time of loss or damage," 2) does not require Blackjack to repair or replace the damaged property, and 3) does not restrict Blackjack's use of the insurance proceeds. (Docket No. 92 at 12–13).

As to the first point, Blackjack's position is very unclear. The policy language requires New Hampshire to "determine the value of Covered Property in the event of loss or damage at replacement cost (without deduction for depreciation) as of the time of loss or damage." (Docket No. 56-1 at 16). To agree with Blackjack that this is what the policy says is easy to do—it's a conclusion that relies on the policy's very words. But Blackjack then insists that the "plain meaning of this phrase is that the amount to be paid for damaged property will be the amount that it would take to replace the property without making any reduction based on the condition of the property before the loss." (Docket No. 92 at 16). New Hampshire fails to appreciate the import of Blackjack's exegesis, (Docket No. 103 at 4), and, frankly, so does the Court. Given the ambiguity of Blackjack's position, the Court denies Blackjack's motion as to the meaning of the policy's "replacement cost" term.

The parties agree on the second point. (*Id.* at 2–3). The Court will treat as established the fact that the policy does not require Blackjack to repair or replace the damaged property. *See* Fed. R. Civ. P. 56(g).

As to the third point, both sides also largely agree, but New Hampshire adds an important parenthetical to the fact Blackjack hopes to lock down. Specifically, New Hampshire "generally

acknowledges that the policy did not impose any obligations or restrictions on Blackjack's use of the insurance proceeds received from New Hampshire *(although Blackjack's chosen use of the funds directly impacts separate claims for alleged cost overruns and alleged business interruption)*." (Docket No. 103 at 3 (emphasis added)). The Court understands New Hampshire's caveat to reflect the well-worn view that "[e]very contract"—including one for insurance—"contains an implied duty of good faith and fair dealing in its performance and enforcement," and that "reasonable" is a "qualifying word which may be read into" every agreement. *Hurley v. Tenn. Farmers Mut. Ins. Co.*, 922 S.W.2d 887, 892 (Tenn. Ct. App. 1995). In other words, since the implied duty of good faith and fair dealing necessarily inheres in the way the parties must perform and enforce the policy, the policy does not restrict Blackjack's *reasonable* use of the insurance proceeds, but it may well place limits on its *unreasonable* use.

Here, that means Blackjack can use the insurance proceeds in any way it sees fit, but not, for example, to increase the value of additional claims under the policy. (Whether Blackjack's use of the proceeds was reasonable, of course, remains to be seen.) Although Blackjack does not take issue in its reply brief with New Hampshire's parenthetical, given the difference between Court's conclusion and Blackjack's wholly unqualified rendering of what the policy permits, the Court denies Blackjack's summary-judgment motion on this issue.

In sum, the Court denies Blackjack's motion as to the meaning of the policy's "replacement cost" term, grants it as to the fact that the policy does not require Blackjack to repair or replace the damaged property, and denies it as to Blackjack's insistence that the policy imposes no qualification on its ability to use the insurance proceeds.

*B. Challenges to assessed storm damages*

Blackjack next asks the Court to establish that New Hampshire may not challenge the extent of the damage that Silvera identified soon after the storm, and instead can only seek a return of the proceeds paid based on Blackjack's alleged misrepresentations or concealments. (Docket Nos. 88 at 2 & 92 at 18). The "only question relevant" to New Hampshire's claim, Blackjack correctly points out, is "whether Blackjack Cove made material representations concerning the claim or its application for insurance." (Docket No. 112 at 3).

Misrepresentations made either in an application for insurance or in the claims process can prevent recovery on a policy. With respect to the former, Tennessee law provides that

> [n]o written or oral misrepresentation or warranty therein made in the negotiations of a contract or policy of insurance, or in the application therefor, by the insured or in the insured's behalf, shall be deemed material or defeat or void the policy or prevent its attaching, unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter represented increases the risk of loss.

Tenn. Code Ann. § 56-7-103. Whether an insured's representations on an application are true or untrue is a question of fact for a jury that a court may not decide "unless the minds of reasonable men could reach only one conclusion" as to their truth or falsity. *Womack v. Blue Cross & Blue Shield of Tenn.*, 593 S.W.2d 294, 295 (Tenn. 1980). "The same is true if the insur[e]r claims that false answers were made with intent to deceive." *Id.* But if, instead, the insurer's theory is that the false answers "materially increased the risk of loss," then "a question of law arises." *Id.* In other words, "[t]he jury may determine whether the answers were false and, if so, whether there was intent to deceive, but only the trial judge may determine whether false answers materially increased the risk of loss." *Id.*; *see also Smith v. Tenn. Farmers Life Reassurance Co.*, 210 S.W.3d 584, 589 (Tenn. Ct. App. 2006). "[A]n alleged materially false statement made in an

application for insurance" will "void the policy *ab initio*." *Nix v. Sentry Ins.*, 666 S.W.2d 462, 463–64 (Tenn. Ct. App. 1983).

An insurer, however, must show a more specific degree of intent when it seeks to avoid its obligations under an insurance policy due to misrepresentations made after the issuance of the policy and in connection with a loss.[1] In that case, "any false statements in a proof of loss must be willfully false in some material matter and made with intent to deceive." *Id*. at 464. "Fraud involves a question of fact, and the facts must show an intent to deceive on a material matter." *Wilder v. Tenn. Farmers Mut. Ins. Co.*, 912 S.W.2d 722, 726 (Tenn. Ct. App. 1995). Whatever ways in which the standards diverge, Tennessee courts have never indicated that determining the fact and degree of falsity and an insured's intent are questions of law for the court.

In this case, the New Hampshire policy issued to Blackjack includes the following provision:

> **Misrepresentation and Fraud:** The entire contract shall be void if, whether before or after a loss, the Insured has concealed or misrepresented any material fact or circumstances concerning the insurance or the subject thereof, or the interests of the Insured thereon, or in case of any fraud or false swearing by the Insured resulting thereto.

---

[1] The Tennessee Supreme Court articulated the reasons underlying this difference over a century ago:

> When the false swearing is in the application it forms the basis upon which the contract rests, and if fraud enters into it the policy would be voided even though the policy does not so provide. But after the loss occurs then voiding the policy is in the nature of a penalty or forfeiture; in other words, in such cases the holding is virtually that, although the insured has had a loss, and may be entitled to recover from it, yet, as he has been guilty of fraud in the proofs, he must have his policy vacated and set aside as a punishment for such fraud, or attempted fraud. In the latter case, as in all cases of forfeiture, a strict construction should be adopted, and the forfeiture not endorsed except on the plainest grounds, if at all.

*Boston Marine Ins. Co. v. Scales*, 49 S.W. 743, 746 (Tenn. 1899).

(Docket No. 88-11 at 9). Blackjack wants the Court to say that New Hampshire can demand repayment *only* if it proves that Blackjack forfeited its rights through material misrepresentations; what's verboten, as far as Blackjack is concerned, is any argument that calls into question the extent of damage New Hampshire's surveyor scoped out. (Docket No. 92 at 18).

Blackjack's argument fails because it refuses to see the nested nature of New Hampshire's theory. The insurer claims Blackjack concealed and misrepresented material information in part because it misled the surveyor about the origins of the bid on which he based his reasonable cost estimates. (Docket No. 103 at 4–6). To be specific, New Hampshire says Bagsby led Silvera to believe Bobby Reed Marine Works bid to do the repair work on the marina. This bid served as the basis of New Hampshire's payment on Blackjack's initial claim. But New Hampshire later learned that Bagsby himself drew up the bid and that a construction company Bagsby controlled subsequently did the repair work. All along, New Hampshire alleges, Bagsby intended that his company would do the repair work but failed to disclose this to the surveyor. Whether Bagsby's representations were material, willfully false, and intended to deceive the insurer are all questions a jury may properly decide. As a result, and because Blackjack does not point to any authority that supports its claim that New Hampshire can't question Blackjack's initial claim, the Court denies Blackjack's motion on this point.

### C. Misrepresentations made in the claim process

Blackjack also wants the Court to conclude it did not make any material misrepresentations or conceal any material information during the claim process and in its application for insurance in the first instance. But, as noted, the Court can only snatch such

questions from the jury's hands if "the minds of reasonable men could reach only one conclusion" as to whether or not they amount to material misrepresentations. *Womack*, 593 S.W.2d at 295. The Court is not so confident. Again, with respect to the so-called Bobby Reed bid, New Hampshire quite plausibly argues that had it known that

> Bagsby had typed and falsified the letterhead on the bid Blackjack submitted in support of the initial claim, and that his company intended to handle the remediation work, New Hampshire undoubtedly would have taken a closer look at the figures, possibly requested another bid, and ensured at the very least that [Bagsby's construction company] was competent to do the work and would complete it for the bid amount such that no future claims would arise.

(Docket No. 103 at 8). Could, for example, a jury determine that Bagsby concealed his role in the bid-generation process in a manner that swayed New Hampshire's assessment of the value of the claim? Surely. This and other fact questions preclude summary judgment in Blackjack's favor as to whether it misrepresented or concealed material information during the claim process.

### D. Misrepresentations made in Blackjack's application

The same is true with respect to information misrepresented or concealed when Blackjack applied for insurance. The main point of contention between the parties is whether Blackjack had an insurable interest in the Drakes Creek docks, and Blackjack advances two lines of argument seeking to establish that it did. First, Blackjack says that although title didn't pass from the former owner of those docks to Blackjack before they were damaged in the storm, it had an insurable interest in them because it entered into an oral agreement to purchase the docks before New Hampshire issued the policy. New Hampshire responds that while Bagsby says the oral agreement was reached before the policy was issued, the former owner of the docks wasn't so sure. (Docket No. 112-2 at 6–8). Second, Blackjack argues it had an insurable interest in the

docks because the docks were an essential part of its business plan and Blackjack anticipated it would profit from their continued existence. (Docket No. 92 at 36–38). New Hampshire doubts that incorporating projected future profits from a planned purchase into a business plan creates an insurable interest. (Docket No. 103 at 15).

For an insurance contract to be valid, "the insured [must] have an 'insurable interest' in the property insured; otherwise, the contract amounts to no more than a wager" and is void because it violates public policy. *Duncan v. State Farm Fire & Cas. Co.*, 587 S.W.2d 375, 376 (Tenn. 1979). In Tennessee, "one has an insurable interest in property if by its continued existence he will gain an advantage, or if by its damage or destruction he will suffer a loss, whether or not he has any title in, lien upon or possession of the property." *Id.* It is "not necessary to show for a certainty that the insured would sustain economic injury from loss of the insured property"; rather, it is "sufficient that loss of the property might subject the insured to such injury." *Id.* Critically, where the claim "rests on debatable ground," "the existence or nonexistence of an insurable interest is a question of fact to be determined from the evidence." *Kopetovske v. Mutual Life Ins. Co. of N.Y.*, 187 F. 499, 505 (6th Cir. 1911); *see also* 3 Couch on Ins. § 41:10 ("factual issues, such as whether a nephew has an insurable interest in the life of his uncle, may depend upon whether such relations exist between them as to give rise to a reasonable expectation of pecuniary advantage or benefit from the continued existence of the life insured[,] are to be resolved by the trier of fact") (citing *Kopetovske*, 187 F. 499); *Country Life Ins. Co. v. Marks*, 592 F.3d 896, 900 (8th Cir. 2010) (holding, under Missouri law, that "[w]hether a party has an insurable interest due to a pecuniary interest is a question of fact when the parties dispute (as they do here) the basis for the pecuniary interest").

Amidst the fog of factual disputes here, a jury will have to decide whether Blackjack had an insurable interest in the docks. A jury may decide that Blackjack entered into an enforceable agreement to purchase the Drakes Creek docks before taking out the insurance policy, or it may decide that, based on the facts and circumstances presented, it did not. Similarly, a jury may determine that Blackjack could reasonably expect to gain an advantage from the docks during the same time period, or it could decide that such an expectation was much too speculative to create an insurable interest in the docks. Either way, the question is properly put to the jury, not the Court. Accordingly, the Court denies summary judgment to Blackjack on whether it misrepresented or concealed information in its application for insurance.

To sum up: the Court denies Blackjack's summary-judgment motion on all issues except as to the fact that the policy does not require Blackjack to repair or replace the damaged property, which the Court will consider as an established fact for trial.

### III. *New Hampshire's second motion for partial summary judgment*

New Hampshire's second partial-summary-judgment motion seeks judgment as a matter of law on a variety of issues.

#### A. *Drakes Creek dock agreement*

First, New Hampshire asks the Court to hold that Blackjack's pre-storm oral agreement to purchase the Drakes Creek docks is unenforceable because it falls within Tennessee's statute of frauds, *see* Tenn. Code Ann. §§ 29-2-101 & 47-2-201. New Hampshire's view is that if Blackjack did not own the Drakes Creek docks until it signed a *written agreement* to purchase them—which, the parties agree, happened after the storm—then those docks were not insured under the policy.

New Hampshire's statute-of-frauds argument comes up short. Tennessee's longstanding rule holds that "a third party cannot object to enforcement of a contract by raising the statute of frauds." *Lancaster v. Ferrell Paving, Inc.*, 397 S.W.3d 606, 613 (Tenn. Ct. App. 2011) (citing *Anderson v. Hacks Crossing Partners*, 3 S.W.3d 482, 486 (Tenn. Ct. App. 1999); *Bailey v. Henry*, 143 S.W. 1124, 1127 (Tenn. 1912); *Brakefield v. Anderson*, 10 S.W. 360, 362 (Tenn. 1889); *Culwell v. Culwell*, 133 S.W.2d 1009, 1012 (Tenn. Ct. App. 1939)). More, oral contracts that fall within the statute of frauds are not void *ab initio*, but "merely voidable at the election of either party." *Anderson*, 3 S.W.3d at 485. Here, neither Blackjack nor the previous owner of the Drakes Creek docks has raised the statute of frauds as a defense to bar enforcement of the contract. And since New Hampshire wasn't a party to their deal, it can't interpose itself in their relationship to question the enforceability of the contract under Tennessee's statute of frauds.

New Hampshire also derides Blackjack's oral contract as nothing more than an unenforceable agreement to agree that did not legally bind Blackjack to purchase the Drakes Creek docks. (Docket No. 103 at 14–15). New Hampshire says that Blackjack's own characterization of the oral agreement—that "Blackjack Cove would purchase [the docks] if it purchased the marina," (Docket Nos. 102 at 3 & 103 at 14)—proves the point. But that's wrong. This phrasing is equally susceptible to a reading that identifies the purchase of the marina as a condition precedent to the dock purchase. As a legal matter, neither Blackjack's own description of the oral agreement nor the inconclusive record evidence to which New Hampshire points shows that Blackjack did not make an enforceable, pre-storm agreement to purchase the Drakes Creek docks.

*B. Damages claims*

The remainder of New Hampshire's second summary-judgment motion focuses on certain damages Blackjack claims.

*1. Asphalt repair*

The first of those is a $354,000 cost Blackjack incurred to repair damage to asphalt in certain areas of the marina due to the weight of heavy trucks removing debris and delivering construction materials. Blackjack cites two provisions of its insurance policy under which coverage for this loss may fall. The first provision covers the "Debri[s] Removal expense of covered property caused by or resulting from a covered peril[.]"[2] (Docket No. 136-11 at 29). The second provision provides coverage for certain "necessary expenses [the insured] incur[s] during the 'period of restoration' that [the insured] would not have incurred if there had been no direct physical loss of damage to property caused by or resulting from a Peril Insured Against." (*Id*. at 31).

New Hampshire cites various reasons why Blackjack can't find relief in either provision. In the interests of brevity, the Court focuses only on the debris-removal provision since the presence of any pathway to relief precludes summary judgment. New Hampshire says the policy bars coverage under that provision for two reasons. First, the insurer contends the "covered peril" here—the storm—did not cause the asphalt damage. And second, New Hampshire claims the area with the damaged asphalt is not "covered property," which under the policy includes

---

[2] New Hampshire correctly points out that even if the debris-removal provision covered the asphalt damage, the policy limits such expenses to $100,000, which is less than the $354,000 Blackjack seeks. (*See* Docket No. 136-11 at 29).

Blackjack's "piers, wharves and docks, floats, platforms, gangplanks, pilings, wiring, pipes, ground tackle, mooring, buoys and all other property with forms a part thereof[.]" (*Id*. at 29).

Both arguments fall flat. For one thing, New Hampshire reads the debris-removal provision's causation language too narrowly. While the storm did not "cause" the asphalt damage, a reasonable jury could find the asphalt damage "resulted from" the storm. For another, the parties appear to dispute where the asphalt damage occurred. Although Blackjack says the damage was in "construction traffic areas," (Docket No. 134-8 at 12), New Hampshire situates it elsewhere. In its opening brief, New Hampshire locates the damage at "a public boat ramp." (Docket No. 133 at 9). In its reply brief, oddly, the asphalt damage is in a "parking lot." (Docket No. 143 at 2–3). On this conflicting record, the Court cannot conclude that the location of the damaged asphalt is not "covered property." For these reasons, among others, a jury will have to decide whether and to what extent the policy covers the asphalt damage in question.

### 2. *Dry stack facility rents and sales*

New Hampshire next seeks summary judgment on two categories of damages—$982,284 in lost rents and between $635,040 and $1,292,760 in lost sales—that Blackjack claims it sustained because it was unable to build and operate a dry stack facility that would enable customers to store their boats at the marina.

The actions Blackjack took to develop the dry stack facility are contextually important. In an affidavit submitted with Blackjack's response to New Hampshire's motion, Bagsby explained that when Blackjack sought approval from the Army Corps of Engineers to take over the marina, it submitted a plan that included the construction of a dry stack facility on the premises in the second year of operations. (Docket No. 136-14 at 4). The dry stack facility was also included in

the valuation appraisal of the marina Blackjack received in mid-March 2009. (Docket No. 136-10 at 25). Blackjack also got project-specific funding for the construction of the dry stack facility from its lender, Commerce Union Bank. (Docket No. 136-2 at 3–4). But when New Hampshire failed to timely pay Blackjack's supplemental claim, Blackjack had to ask the bank for permission to divert the funds to pay for storm-construction expenses. (*Id*.).

In October 2009, while its second claim was still pending, Blackjack submitted an application to the Corps to begin construction on the dry stack facility. (Docket No. 138-2 at 9–10). That same month, Blackjack purchased a marine travel lift needed for the dry stack facility. (Docket Nos. 138-1 at 2 & 138-3 at 2). Blackjack also obtained commitments from boat owners to ensure the dry stack facility had at least 50% occupancy when it opened, as the Corps' approval process mandated. (Docket No. 138-1 at 2).

Blackjack understood that the Corps required construction to begin within 180 days of the date it approved the dry-stack-facility application, so Blackjack slowed down the approval process after it learned that New Hampshire was slow-walking its supplemental claim. (*Id*.). The Corps finally approved Blackjack's request on September 1, 2010, (*id*. & Docket No. 138-4 at 2–3), but Blackjack could not begin construction then because it was unable to secure additional financing to build the facility, (Docket No. 136-1 at 63–64). Ultimately, Blackjack did not build the facility and the Corps granted approval to a different marina to add one. (Docket No. 138-1 at 2–3). Blackjack believes the Corps will not reapprove its dry stack facility because the government agency evaluates such applications based on need and has since approved a similar facility at a nearby marina. (*Id*.).

Blackjack calculated its damages based on several assumptions. (*Id*. at 3). Bagsby determined gross lost rents using normal slip rental rates for a dry stack facility assuming a 75% occupancy rate—lower than the approximately 90–95% occupancy rate at which the marina has operated since Blackjack took it over—over a three-year period. (*Id*.). The post-construction expenses to operate the facility, Bagsby said, would have been minimal, mainly a $20,000 annual cost to hire part-time seasonal employees. (*Id*.). With respect to lost sales, Bagsby stated that marina tenants spend an average of $350 a month at Blackjack's restaurant and store. Assuming the dry stack facility operated at 75% capacity (again, 15–20% lower than the marina's rate), and further assuming that the restaurant and store had 28–57% profit margins, Bagsby estimated the net lost profits after deduction of expenses of $635,040–1,292,760 over three years.

New Hampshire objects to Blackjack's damages claims related to the dry stack facility on three grounds. First, New Hampshire argues that the bases of Blackjack's requests—Bagsby's affidavit and deposition testimony—are insufficient as matter of law to show the claimed damages are anything but speculative, primarily because Bagsby never before operated a marina and the marina never had a dry stack facility. The Court thinks a reasonable jury could conclude otherwise and should be given an opportunity to weigh the evidence.

A party can recover lost profits following a breach of contract under Tennessee law. *Grantham & Mann, Inc. v. Am. Safety Prods, Inc.*, 831 F.2d 596, 602 (6th Cir. 1987) (applying Tennessee law). "As a general rule, damages are not permitted which are remote and speculative in nature. This rule serves to preclude recovery, however, only where the fact of damage is uncertain, *i.e.*, where the damage claimed is not the certain result of the wrong, not where the amount of damage alone is uncertain." *Id*. at 601–02 (citations and internal quotation marks omitted). After "the existence of damages has been shown, all that an award of damages requires

is substantial evidence in the record to permit a factfinder to draw reasonable inferences and make a fair and reasonable assessment of the amount of damages." *Id*. at 602.

In this case, the actions Blackjack took to develop the dry stack facility—seeking and receiving approval from the Corps of Engineers, getting rental commitments from boat owners, securing a separate line of financing, and purchasing equipment like the marine travel lift— remove its lost-rental damages claims from the purely speculative realm. No doubt, Blackjack never operated a dry stack facility, and it certainly never sold items from its restaurant or store to the never-built facility's customers. But the construction and operation of the facility were more than some pipedream. And the significant investments undertaken to realize it could enable a reasonable jury to conclude that Blackjack incurred damages because the dry stack facility never came to fruition.

New Hampshire's second objection to Blackjack's damages claims related to the dry stack facility is that Blackjack failed to deduct expenses from its calculations.[3] Again, the Court is unconvinced that Blackjack's inability to drill down to the level of specificity that New Hampshire prefers is a reason to bar Blackjack from recovering lost-rent and lost-sales damages as a matter of law. In Tennessee, as New Hampshire correctly points out, "the recovery of lost profits must be based on net profits and not on gross profits." *Am. Bldgs. Co. v. DBH Attachments, Inc.*, 676 S.W.2d 558, 563 (Tenn. Ct. App. 1984). A jury could conclude that Blackjack's figures meet that test. While it did not include the specific costs of constructing and operating the dry stack facility in its lost-rent calculation, a factfinder could nonetheless conclude that Blackjack's estimates reflect those additional expenses, as the reduced occupancy rate they

_____

[3] This objection applies only to the lost-rent claim, since the lost-sales estimate is based explicitly on a profit-margin range at the marina's store and restaurant.

are based on (75%, as compared to the marina's higher rate of 90–95%) is captures the costs associated with building and maintaining the dry stack facility.

The final protest New Hampshire lodges against Blackjack's request for damages related to the unbuilt dry stack facility is that the facility was not covered property under Blackjack's insurance policy and that the alleged damages to it did not result from a covered loss. (New Hampshire develops the argument no further than that.) Blackjack responds in two ways. First, it says, New Hampshire's narrow focus on the policy's terms and limits ignores that Blackjack asserts several alternative theories of liability: not only does it advance a claim for breach of the policy, but Blackjack also seeks recovery for New Hampshire's misrepresentations, bad faith, and violations of the TCPA. Second, Blackjack asserts it may recover consequential damages, in addition to payment of outstanding insurance proceeds, under a simple breach-of-contract claim. *See, e.g.*, *GuestHouse Intern., LLC v. Shoney's N. Am. Corp.*, 330 S.W.3d 166, 206–07 (Tenn. Ct. App. 2010) (quoting *Chambliss, Bahner & Crawford v. Luther*, 531 S.W.2d 108, 110 (Tenn. Ct. App. 1975)). New Hampshire does not address either argument. Summary judgment in its favor on the question of dry-stack-facility damages is inappropriate.

### 3. Reputational damage

New Hampshire next seeks summary judgment on Blackjack's claim for lost-profits damages due to reputational injuries Blackjack suffered after New Hampshire filed this suit, starting with a complaint allegedly filled with false allegations. New Hampshire says it is entitled to judgment as a matter of law because, first, Tennessee's litigation privilege bars Blackjack's claim and, second, Blackjack has failed to provide sufficient proof of its damages. Both arguments run aground.

In general, "statements made in the course of a judicial proceeding that are relevant and pertinent to the issues involved are absolutely privileged and cannot be the predicate for liability in an action for libel, slander, or invasion of privacy." *Lambdin Funeral Serv., Inc. v. Griffith*, 559 S.W.2d 791, 792 (Tenn. 1978). "[T]his is true regardless of whether [the statements] are malicious, false, known to be false, or against a stranger to the proceeding." *Simpson Strong-Tie Co., Inc. v. Stewart, Estes & Donnell*, 232 S.W.3d 18, 23 (Tenn. 2007). Tennessee courts alternatively call this liability shield a "litigation privilege" or a "judicial privilege." *Compare id*. at 22–23 ("litigation privilege") *with Trau-Med of Am., Inc. v. Allstate Ins. Co*., 71 S.W.3d 691, 702 (Tenn. 2002) ("judicial privilege") *and Spain v. Connolly*, 606 S.W.2d 540, 543 (Tenn. Ct. App. 1980) (describing *Lambdin*'s affirmance of the trial court's dismissal of a libel and slander suit on the ground of "judicial privilege").

In *Trau-Med*, the Tennessee Supreme Court made clear that "the defense of judicial privilege is available to actions of *defamation*." 71 S.W.3d at 702. *Trau-Med* declined to extend the litigation privilege from defamation claims to claims for intentional interference with business relationships, and adopted the "better view . . . contained in the Restatement (Second) of Torts sections 585–589." *Id*.; *see also* Restatement (Second) of Torts § 585 ("A judge or other officer performing a judicial function is absolutely privileged to publish defamatory matter in the performance of the function if the publication has some relation to the matter before him."); *id*. § 586 ("An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding."); *id*. § 587 ("A party to a private litigation or a private prosecutor or defendant in a criminal prosecution is absolutely privileged to publish

defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding."); *id*. § 588 ("A witness is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding or as a part of a judicial proceeding in which he is testifying, if it has some relation to the proceeding."); *id*. § 589 ("A member of a grand or petit jury is absolutely privileged to publish defamatory matter concerning another in the performance of his function as a juror, if the defamatory matter has some relation to the proceedings in which he is acting as juror.").

Limited in this way, the litigation privilege plainly has no application in this case. Just as in *Trau-Med*, in which the party against whom the privilege was asserted similarly disclaimed reliance on a defamation theory, Blackjack submits it "has not filed a defamation claim" against New Hampshire. (Docket No. 136 at 11). Moreover, this Court has previously recognized in a published opinion that an insurer may be liable for litigation-related conduct under theories that do not sound in defamation. *See Nat'l Union Fire Ins. Co. of Pittsburgh v. Small Smiles Holding Co., LLC*, 781 F. Supp. 2d 597, 601 (M.D. Tenn. 2011) (holding that an insurer that files a declaratory judgment action "based upon allegations which are fundamentally false" may be liable under the TCPA). Although Blackjack is unclear with respect to which substantive claim or claims it tethers its request for profits lost due to reputational damages, it certainly does not assert a cause of action for defamation. And as much as New Hampshire may say that Blackjack has "essentially" done so, Blackjack—not New Hampshire—is the master of its complaint (or countercomplaint, as the case may be) and so gets to choose the causes of action it travels under.

*See generally NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 458 (6th Cir. 2007).  The litigation privilege does not apply to the claims in this case.

As for New Hampshire's argument that it's entitled to summary judgment on Blackjack's claim for lost profits due to reputational injuries because Blackjack has failed to provide sufficient proof of its damages, that too goes astray.  The question is whether evidence exists that would enable a reasonable jury to conclude that the damages Blackjack claims are the certain result of New Hampshire's alleged wrong, and whether the factfinder could draw reasonable inferences from that evidence to fairly assess the amount of damages.  *See Grantham & Mann, Inc.*, 831 F.2d at 602.  New Hampshire selectively quotes Bagsby's deposition testimony to bolster its view that Blackjack's claim rests on "rank speculation"—presumably as to both the existence and amount of lost profits.

But this glosses over other parts of Bagsby's deposition, which describe several categories of damages and refer to sources to calculate the claimed amounts.  For example, Bagsby narrated the conversation he had with potential customers on "multiple occasions . . . [while] negotiating a deal for slip rent on a nice boat . . . [who] said, Have you got that lawsuit deal taken care of yet?  Well, no, sir, we're in litigation now.  Well, I saw that on the Internet.  Why don't you put our name in your file and maybe give us a call later on.  We just probably don't wanna be here right now."  (Docket No. 136-1 at 59).  Bagsby also testified about losing money on boat rentals because "the Hampton Boat dealer franchise is pending the outcome of this lawsuit" and that the deal could not be finalized before "this lawsuit is settled."  (*Id*. at 60).  And he further related that he "can't borrow money right now," explaining that lenders who require him to "disclose on my personal financial statement and my business financial statements

that I am involved in litigation and the amount of the litigation" turn away once they learn of the allegations against him. (*Id*. at 62–63).

Blackjack's evidence is extremely thin, but whether a jury ultimately finds the claim credible is not the question; at bottom, the evidence could enable a reasonable factfinder to establish the fact of these damages and ascertain their amount.

### 4. *"Totaling" the damaged docks*

New Hampshire next asks the Court to enter summary judgment in its favor on Blackjack's nearly $1.6 million damages claim for the value Blackjack lost due to New Hampshire's "failure to 'total' docks" at the marina. (Docket No. 135-8 at 13). As it explains in its response brief, Blackjack hopes to recover "the difference between the value of the property [it] should have had [under the policy] and the value of the property that it ended up with." (Docket No. 136 at 13). Specifically, Blackjack complains that although the policy "provided that damaged property would be valued at 'replacement cost,'" it "was left with patched-up 40 year old docks rather than new docks." (*Id*.)

The Court agrees with New Hampshire that summary judgment is appropriate on this claim. The policy provides that New Hampshire will "determine the value of Covered Property in the event of loss or damage at replacement cost (without deduction for depreciation) as of the time of loss or damage." (Docket No. 56-1 at 16). The Court is hard-pressed to understand why New Hampshire was required to "total" the docks, and Blackjack points to no provision of the policy that supports its argument. Nor does Blackjack explain why the policy terms entitle it to "new docks" rather than "patched-up 40 year old docks" if those patches restore the docks' total value to what it was when the docks were insured in 2009, *i.e.*, "without deduction for

depreciation." As Blackjack has failed to point to evidence that demonstrates a triable material fact on this damages claim, the Court grants New Hampshire summary judgment on it.

### 5. *Increased insurance costs*

New Hampshire finally seeks summary judgment on Blackjack's claim for damages that allegedly stem from New Hampshire's refusal to renew the insurance policy and its claims of fraud against Blackjack. (Docket No. 135-8 at 13). New Hampshire makes three arguments in support. (Docket No. 133 at 16). First, it asserts that the litigation privilege bars Blackjack's claim. As the Court has held, though, the privilege does not apply in this case. (*Id*.). Second, New Hampshire maintains it was not required to renew the policy, (*id*.), a proposition with which Blackjack does not disagree, (Docket No. 136 at 14). Third, New Hampshire argues that no admissible evidence supports Blackjack's claim. (Docket No. 143 at 11–12).

Summary judgment on this claim is inappropriate because Blackjack has minimally supported its contention that New Hampshire's actions resulted in the claimed damages. For example, Bagsby stated in his deposition that "the money that it costs to secure" insurance has increased because of "[t]he time that it takes to provide the documentation, the professional help, the professional fees" that prospective insurers now require of Blackjack. (*Id*. at 53, lines 23–25). Unlike before, new insurers want Blackjack "to sit down and . . . explain to them where we [are] in the suit, what the suit [is] based on, what their risks [are], [and] [are] they really dealing with a fraud" as New Hampshire says. (*Id*. at 49, lines 3–8; *see also id*. at 50, lines 13–17). As a result, Blackjack wants to recover for the costs of "increased attorney fee[s] and accounting time," as well as associated administrative expenses. (*Id*. at 54, lines 2–24).

In the end, a jury will decide whether Blackjack can stand on this thin reed, but for present purposes the Court is satisfied a jury could rely on this evidence to both decide the existence of damages and fix their amount. The Court denies summary judgment on this claim.

IV.     *Motion to strike*

Finally, New Hampshire moves to strike Bagsby's affidavit detailing damages amounts that Blackjack filed in response to New Hampshire's second summary-judgment motion. As should be apparent from the analysis above, the Court will deny the motion.

A party must divulge "a computation of each category of damages" it claims and must "make available for inspection . . . the documents or other evidentiary material . . . on which each computation is based." Fed. R. Civ. P. 26(a)(1)(A)(iii). A party must also supplement or correct any disclosure or response made under Rule 26(a) "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." *Id*. 26(e)(1)(A). "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *Id*. 37(c)(1). "[T]he sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless[.]" *Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 782 (6th Cir. 2003) (quoting *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998)).

New Hampshire accuses Blackjack of failing to supplement its disclosures with the information contained in Bagsby's affidavit. While supplementation would undoubtedly have

been the best practice, Blackjack's failure to do so in this case was harmless. Blackjack says that "[e]verything" contained in Bagsby's affidavit "is found or referenced" in a single-spaced, 15-page letter with 39 exhibits that Blackjack sent to New Hampshire on August 10, 2012. (Docket No. 140 at 4). Both parties refer to this letter, but neither has made it part of the record, presumably because it was a settlement communication. (*Id.*; Docket No. 139 at 2 n.1). Even though the Court has not reviewed its contents, it takes lawyers appearing before it at their word. *See Demjanjuk v. Petrovsky*, 10 F.3d 338, 352 (6th Cir. 1993) ("As an officer of the court, every attorney has a duty to be completely honest in conducting litigation."). Given that Blackjack disclosed the pertinent information through other channels, its failure to do so via formal supplementation was objectionable and ill-advised, but harmless.

New Hampshire also combs Bagsby's affidavit for inadmissible portions and groans about several of them. (Docket No. 139 at 6–7 ). The Court finds New Hampshire's various objections unavailing. New Hampshire loses sight of the rule, which says that "[a] party may object that the material cited to support or dispute a fact *cannot* be presented in a form that would be admissible in evidence"—not merely that it currently is not presented in an admissible form. Fed. R. Civ. P. 56(c)(2). On review, the Court concludes that the statements in the affidavit on which the Court relies can be presented in an admissible form. The Court denies New Hampshire's motion to strike.

## CONCLUSION

For the foregoing reasons, the Court will deny New Hampshire's first motion for partial summary judgment, (Docket No. 86); grant in part (as to establishing the fact that the insurance policy at issue does not require Blackjack to repair or replace the damaged property) and deny in

part (as to all other issues) Blackjack Cove's motion for partial summary judgment, (Docket No. 88); grant in part (as to Blackjack's claim for damages stemming from New Hampshire's alleged failure to "total" docks at the marina) and deny in part (as to all other issues) New Hampshire's second motion for partial summary judgment, (Docket No. 133); and deny New Hampshire's motion to strike, (Docket No. 139).

An appropriate Order will be entered.

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE